G.P. PUBLICATIONS, INC. v. QUEBECOR PRINTING—ST. PAUL, INC.

[125 N.C. App. 424 (1997)]

G.P. PUBLICATIONS, INC., AND TECHNOLOGY FUNDING SECURED INVESTORS II,
PLAINTIFFS v. QUEBECOR PRINTING—ST. PAUL, INC., AND SIGNAL RESEARCH,
INC., DEFENDANTS

No. COA96-248

(Filed 4 March 1997)

1. **Corporations § 208 (NCI4th)— successor corporation—liability for old corporation's debts—exceptions to general rule**

    Generally, the purchaser of all or substantially all the assets of a corporation is not liable for the debts of the old corporation. However, exceptions to this general rule permit successor liability when (1) there is an express or implied agreement by the purchasing corporation to assume the debt or liability, (2) the transfer amounts to a *de facto* merger of the two corporations, (3) the transfer of assets was done to defraud the corporation's creditors, or (4) the purchasing corporation is a "mere continuation" of the selling corporation in that it has some of the same shareholders, directors, and officers.

    **Am Jur 2d, Corporations §§ 2575, 2577, 2707-2727.**

    **Similarity of ownership or control as basis for charging corporation acquiring assets of another with liability for former owner's debts. 49 ALR3d 881.**

    **Liability of shareholders, directors, and officers where corporate business is continued after its dissolution. 72 ALR4th 419.**

2. **Corporations § 208 (NCI4th)— successor corporation—liability for old corporation's debts—foreclosure sale under UCC**

    A foreclosure sale under UCC § 9-504 does not absolutely preclude successor liability on the theory that a new corporation is a mere continuation of a prior debtor corporation. Therefore, a successor liability claim was not absolutely barred where a secured creditor purchased the debtor's assets at a UCC § 9-504 foreclosure sale. N.C.G.S. § 25-9-504.

    **Am Jur 2d, Corporations §§ 2575, 2724.**

G.P. PUBLICATIONS, INC. v. QUEBECOR PRINTING—ST. PAUL, INC.

[125 N.C. App. 424 (1997)]

Similarity of ownership or control as basis for charging corporations acquiring assets of another with liability for former owner's debts. 49 ALR3d 881.

Comment note.—validity and construction of state statute making successor corporation liable for taxes of predecessor. 65 ALR3d 1181.

Liability of shareholders, directors, and officers where corporate business is continued after its dissolution. 72 ALR4th 419.

3. Corporations § 208 (NCI4th)— UCC foreclosure—asset purchase by secured creditor—liability for old corporation's debts—mere continuation—instructions

Where a secured creditor purchased the assets of the debtor corporation in a UCC § 9-504 foreclosure sale and continued the debtor's publishing business in an attempt to recover on the delinquent loan, the trial court erred by instructing the jury on the broadened "substantial continuity" test for determining whether the successor corporation was liable for the old corporation's debt to an unsecured creditor. Rather, the trial court should have instructed the jury only as to the elements of the mere continuation test followed in North Carolina: continuity of ownership, inadequacy of consideration, or lack of some of the elements of a good faith purchaser for value.

Am Jur 2d, Corporations § 2627.

Similarity of ownership or control as basis for charging corporation acquiring assets of another with liability for former owner's debts. 49 ALR3d 881.

Liability of shareholders, directors, and officers where corporate business is continued after its dissolution. 72 ALR4th 419.

4. Corporations § 208 (NCI4th)— UCC foreclosure—asset purchase by secured creditor—new corporation not mere continuation of old

A corporation formed by a secured creditor after purchasing the assets of the debtor corporation at a UCC § 9-504 foreclosure sale was not a mere continuation of the debtor corporation and was thus not liable for the debtor corporation's debt to an unsecured creditor where it was uncontroverted that the debtor cor-

poration does not share any common stockholders or directors with either the successor corporation or the secured creditor, and the jury found that the foreclosure sale, including the price paid for the debtor corporation's assets, was commercially reasonable.

**Am Jur 2d, Corporations §§ 2624-2628.**

**Liability of shareholders, directors, and officers where corporate business is continued after its dissolution. 72 ALR4th 419.**

5. **Appeal and Error § 175 (NCI4th)— instructions—issue not reached—mootness**

The issue of whether the trial court's instruction defining "gross" was erroneous was moot and will not be addressed by the appellate court where the jury did not reach the question of whether the secured creditor acquired the debtor's assets for "grossly inadequate" consideration after it found that a foreclosure sale of the debtor's assets was commercially reasonable.

**Am Jur 2d, Trial §§ 1121, 1139, 1142.**

6. **Unfair Competition or Trade Practices § 31 (NCI4th)— unfair practice—standing to bring action**

Only a debtor and its officers, and not an unsecured creditor of the debtor, had a right to bring an action under N.C.G.S. § 75-1.1 against a secured creditor based upon alleged threats to bring civil and RICO actions against the debtor's officers if the debtor's board of directors did not agree to a friendly foreclosure.

**Am Jur 2d, Extortion, Blackmail and Threats §§ 96, 128-132.**

**Truth as defense to state charge of criminal intimidation, extortion, blackmail, threats, and the like, based upon threats to disclose information about victim. 39 ALR4th 1011.**

**Initiating, or threatening to initiate, criminal prosecution as ground for disciplining counsel. 42 ALR4th 1000.**

**Civil action for damages under state racketeer influenced and corrupt organizations acts (rico) for losses from racketeering activity. 62 ALR4th 654.**

**7. Unfair Competition or Trade Practices § 48 (NCI4th)— unfair practice—absence of damages**

The evidence supported the jury's finding that an unsecured creditor was not damaged by the secured creditor's commission of an unfair practice in violation of N.C.G.S. § 75-1.1 by threatening to bring civil and RICO actions against the debtor's officers and directors if the debtor's board of directors did not agree to a friendly foreclosure; therefore, the trial court did not err in the denial of the unsecured creditor's motion for judgment notwithstanding the verdict on the issue of damages.

**Am Jur 2d, Extortion, Blackmail and Threats §§ 96, 128-132.**

**Truth as defense to state charge of criminal intimidation, extortion, blackmail, threats, and the like, based upon threats to disclose information about victim. 39 ALR4th 1011.**

**Initiating, or threatening to initiate, criminal prosecution as ground for disciplining counsel. 42 ALR4th 1000.**

**Civil action for damages under state racketeer influenced and corrupt organizations acts (rico) for losses from racketeering activity. 62 ALR4th 654.**

Appeal by plaintiff G.P. Publications, Inc., and defendant Quebecor Printing—St. Paul, Inc. from judgment entered 13 June 1995 by Judge W. Steven Allen in Guilford County Superior Court. Heard in the Court of Appeals 29 October 1996.

*Adams Kleemeier Hagan Hannah & Fouts, PLLC, by J. Alexander S. Barrett, and Russell & King, by Edward L. Bleynat, Jr., for plaintiffs.*

*Blanco Takabery Combs & Matamoros, by Peter J. Juran, Rider, Bennett, Egan & Arundel, by Patrick J. Rooney, and Parker Poe Adams & Bernstein, by Catherine B. Arrowood, for defendant Quebecor Printing—St. Paul, Inc.*

WYNN, Judge.

Plaintiffs G.P. Publications, Inc. ("G.P.") and Technology Funding Secured Investors II ("TFSI II") filed a complaint against defendants Quebecor Printing—St. Paul, Inc. ("Quebecor") and Signal Research,

Inc. ("Signal") in October 1992, seeking a declaratory judgment that a foreclosure sale conducted by TFSI II on Signal's assets was commercially reasonable. TFSI II is a California limited partnership that makes secured loans to technology-oriented companies. Signal, formerly a Delaware corporation that published books and magazines about computers and video games, was a customer of Quebecor, a Minnesota corporation whose principal business is printing.

This matter came on for jury trial in May 1995. The plaintiffs' evidence tended to show the following:

In February 1991, TFSI II extended a $2.5 million credit to Signal for debt financing and obtained a first priority security interest in all of Signal's assets. Meanwhile, Quebecor provided printing services to Signal on credit such that by December 1991, Signal owed Quebecor $2.6 million. Quebecor, however, never obtained a security interest in Signal's assets nor obtained guarantees from Signal's management or equity holders. Thus, the debt owed by Signal to Quebecor was completely unsecured.

The basis for this litigation started when Signal defaulted on its loan obligations to TFSI II in late 1991. Repeated work-out negotiations with TFSI II failed, and Signal fired its employees and ceased all operation on 13 February 1992. On 17 February 1992, a majority of Signal's disinterested directors agreed to TFSI II conducting a consensual foreclosure on its assets.

To help preserve the collateral, TFSI II entered into consulting agreements with three former Signal employees: Mike Romano, its head of advertising; Tom Valentino, vice president of finance and its controller; and Selby Bateman, an editor. TFSI II alleged that it relied upon these individuals to determine whether Signal's assets could be: (1) liquidated; (2) sold to a third party; or (3) utilized in an effort to develop a new company.

In an attempt to privately sell Signal's assets, TFSI II contacted over thirty publishers, brokers and Signal competitors. This effort resulted in only one offer: $200,000 in cash and a $1.6 million promissory note in exchange for all the assets, which TFSI II declined due to the lack of adequate cash. Thereafter, TFSI II prepared to conduct a public foreclosure sale under Article 9 of the Uniform Commercial Code ("UCC") at Signal's former offices in Greensboro, North Carolina. It sent Gerry Hansen and Anthony Todd, officers with TFSI II's managing partner, Technology Funding, Inc. ("TFI") and both cer-

tified public accountants, to conduct due diligence on its behalf. Todd estimated a reasonable bid price to be $1.1-$1.2 million for all the collateral.

Regarding the notice given for the foreclosure sale, the parties stipulated to the following facts:

> TFSI II conducted a foreclosure sale on the assets of Signal on March 6, 1992. It had previously posted notice of the sale in accordance with North Carolina law and sent notice to all parties entitled thereto, as well as to the other parties TFSI II thought might be interested in bidding on the assets.

TFSI II did not provide formal notice to Quebecor, which, as an unsecured creditor, was not entitled to it.

In anticipation of the foreclosure sale, a group of Signal investors considered making a bid on the assets. Steve Purcelli, a Signal director and representative for the group, testified that the investors considered bidding $1 to $1.5 million, but ultimately declined to do so because "it would not provide us with an adequate return on our investment."

The foreclosure sale resulted in a single bid by TFSI II. It purchased substantially all of Signal's assets, including its fixed assets, inventory, accounts receivable, intangibles and trademarks for a $1.8 million credit bid. The total debt outstanding to TFSI II at the time was $2.25 million, with the bid leaving a deficiency of $425,000.

After conducting the sale, TFSI II attempted to recover further on its loan by launching G.P. Publications, Inc. ("G.P."), a magazine-publishing business. TFSI II transferred the former Signal assets to G.P. for a $1.8 million promissory note. In addition, TFSI II and its affiliated partnership, Technology Funding Secured Investors III ("TFSI III"), each invested $200,000 in G.P. shares. There was no evidence that either TFSI II or TFSI III ever owned Signal stock, nor that Signal's investors ever owned stock in G.P., TFSI II or TFSI III.

G.P. started business on 9 March 1992, three and a half weeks after the Signal shutdown. It hired a number of employees who had previously worked for Signal. However, G.P's board of directors and officers were made up of individuals who were never affiliated with Signal, with the exception of Romano, Valentino, and Bateman, who now assumed upper management roles. G.P. carried on business at the former Signal location, but paid no Signal debts. TFSI II alleged

that it was unsuccessful in its efforts to liquidate or sell G.P. for an amount even approaching a full recovery on the Signal debt, so it launched new magazine titles and invested still further in G.P. in an attempt to interest a purchaser.

In April 1992, Quebecor obtained a default judgment against Signal for $2.6 million. Quebecor subsequently conducted discovery in aid of its judgment at Signal's offices in New Jersey. At that time, G.P. used a part of the office space for its operations, and had possession of Signal's records. Upon learning that G.P. was searching for a buyer, Quebecor's attorney contacted G.P. regarding potential litigation in a letter dated 4 September 1992:

> I have been informed . . . that GP Publications, Inc. is considering selling its assets and operations. Please be advised that if a sale does take place, my client may be forced to assert any claims that it may have against Signal Research, Inc. and/or GP Publications, Inc., against the purchasing entity [sic].

Thereafter, plaintiffs filed this declaratory judgment action against Quebecor and Signal to have the sale of assets declared proper and not subject to being collaterally attacked or otherwise set aside by Quebecor. Signal failed to answer and default judgment was entered against it.

Quebecor answered and filed a counterclaim against plaintiffs, alleging various theories of successor liability, tortious interference with contract, and fraudulent and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes. Quebecor's evidence at trial tended to show the following:

TFSI II froze Signal's bank accounts and refused to release funds necessary for Signal to meets its payroll causing a complete shutdown of Signal. In a 12 February 1992 letter to Hansen, Robert Lock, president and chairman of Signal's Board of Directors, stated that TFSI II's refusal to allow Signal to meet its payroll "has clearly damaged our business" and noted that "[w]hen done in the context of expressing interest in running the assets yourself is especially troublesome."

Prior to the foreclosure sale, TFSI II entered into consulting agreements with Valentino, Romano and Bateman in an effort to continue the Signal business. Bateman met with Signal employees regarding the possibility of continuing to publish Signal magazines

for a new owner. Valentino evaluated the financial and advertising aspects of a continuation.

Signal's Board of Directors considered filing a Chapter 7 bankruptcy petition which would have resulted in the liquidation of the company's assets. Robert Lock, President and Chairman of Signal, discussed this possibility with TFSI II's Gerry Hansen during a telephone conversation. In a follow-up letter to Hansen dated 13 February 1992, Lock noted his expectation that the board would instruct him to "file a Chapter 7 tomorrow afternoon unless we can do something to keep the assets protected." Thereafter, Hansen threatened "severe implications" and "other avenues of recourse" if Signal filed for bankruptcy. At a 17 February 1992 meeting, TFSI II's attorney informed counsel for Signal that TFSI II was considering suing Lock and Valentino. Quebecor contends that, as a result of this threat, Signal's Board then voted to consent to the "friendly foreclosure" desired by TFSI II.

Thereafter, TFSI II sent foreclosure sale notices to other publishing companies. However, the notices were addressed to no person or department in particular and were sent out only seven days before the scheduled sale. The notices generated almost no interest. The only company to express interest was Compute magazine. TFSI II responded to Compute's inquiry with an offer to sell Signal's assets for a $2.5 million "fire sale" price. However TFSI II provided Compute with no details regarding the assets to be sold and refused to allow Compute to perform its own due diligence.

Quebecor alleges that TFSI II made a conscious decision not to inform it of the foreclosure sale out of fear that Quebecor would have stopped the sale by initiating an involuntary bankruptcy. Upon purchasing Signal's assets, TFSI II transferred them to G.P. for a $1.8 million promissory note.

Quebecor offered evidence showing that all the former Signal employees hired by G.P performed the same functions at the new company that they had previously performed at Signal. G.P. continued to occupy and run the business operations out of Signal's offices in Greensboro and New Jersey. G.P. maintained Signal's mailing addresses, telephone numbers and fax numbers. Quebecor alleged that G.P. produced and sold magazines virtually identical to those produced and sold by Signal and maintained relationships with Signal's vendors, distributors and advertising representative.

Finally, Quebecor alleged that TFSI II paid inadequate consideration for Signal's assets. Quebecor's valuation expert testified that the collateral was worth from $3.5 to $5 million at the time of the foreclosure sale. Quebecor also introduced an investment proposal, created 3 days after the foreclosure sale, in which TFSI II valued G.P. at $2.5 to $3 million.

At the close of all the evidence, the trial court allowed: (1) TFSI II's motion for directed verdict on Quebecor's claim that TFSI II was a "mere continuation" of Signal; (2) TFSI II and G.P.'s motion for directed verdict on Quebecor's claims for tortious interference with contractual rights; and (3) G.P.'s motion for directed verdict on Quebecor's fraudulent trade practice claim. The trial court submitted the remaining issues to the jury which found, *inter alia*, that: (1) TFSI II's sale of Signal's assets was commercially reasonable; (2) TFSI II had not purchased the assets for "grossly inadequate consideration"; (3) G.P. was a "mere continuation" of Signal, but Quebecor had not sustained any damage; and (4) TFSI II wrongfully threatened Signal's board of directors and officers with a civil lawsuit and RICO action if they did not agree to a friendly foreclosure.

In light of the jury's finding that G.P. was a mere continuation of Signal, the trial court entered a judgment in which it held that "Quebecor's remedy as a creditor of the now defunct Signal . . . is to hold G.P. Publications, Inc. . . . liable for Signal's debts." Both parties appeal the trial court's judgment.

---

## G.P.'S APPEAL

The deciding issues raised by G.P.'s appeal are: (I) Whether a commercially reasonable sale under UCC § 9-504 necessarily precludes successor liability, and (II) if not, whether the trial court erred by submitting to the jury the successor liability theory that G.P. was a "mere continuation" of Signal. We hold that while § 9-504 is not an absolute bar to successor liability, the issue of "mere continuation" should not have been submitted in this case. Accordingly, we reverse that part of the judgment holding G.P. liable for Signal's debts on the basis of the "mere continuation" theory of successor liability.

[1] We note at the outset that generally, the purchaser of all or substantially all the assets of a corporation is not liable for the old corporation's debts. *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 687, 370 S.E.2d 267, 269 (1988) (citations omitted). However, there exist four well-settled exceptions to this general rule against

G.P. PUBLICATIONS, INC. v. QUEBECOR PRINTING—ST. PAUL, INC.

[125 N.C. App. 424 (1997)]

successor liability: (1) where there is an express or implied agreement by the purchasing corporation to assume the debt or liability; (2) where the transfer amounts to a *de facto* merger of the two corporations; (3) where the transfer of assets was done for the purpose of defrauding the corporation's creditors; or (4) where the purchasing corporation is a "mere continuation" of the selling corporation in that the purchasing corporation has some of the same shareholders, directors, and officers. *Id.* (citations omitted).

[2] Relying on this last exception, Quebecor premised one of its two successor liability claims on the theory that G.P. was a "mere continuation" of Signal. Prior to considering that contention, however, we must address the threshold issue of whether a UCC Article 9 foreclosure sale acts as an absolute bar against finding successor liability. We hold that it does not.

Plaintiffs argue that UCC § 9-504 necessarily preempts a mere continuation claim because the very purpose of conducting such a sale is to extinguish all inferior interests and convey title free of all claims or encumbrances.[1]

While no North Carolina case directly addresses this particular issue, we find federal case law instructive. In *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F. Supp. 265 (D.N.J. 1994), the United States District Court for New Jersey considered "whether a bank's sale of collateral under a secured agreement pursuant to section 9-504 permits the purchaser not only to take the assets free of any security interest in the collateral but also precludes any claim of successor liability being asserted against the purchasing corporation." *Id.* at 273. After a comprehensive review of other case law on this issue, the court observed, "not only has [defendant] failed to cite any authority for its claim that the purchase of assets at a 9-504 sale *ipso facto* precludes a finding of successor liability; the relevant authorities actually suggest the opposite." *Id.* at 275. The court went on to note that "in successor liability cases the courts should not elevate form over substance." *Id.* Thus, it concluded that "nothing in the UCC supports [defendant's] argument that the 9-504 sale provides a safe harbor against successor liability claims." *Id.* at 274.

---

1. G.P. argues that under the terms of the Loan and Security Agreement between Signal and TFSI II, the North Carolina UCC governs the remedies upon default, while Quebecor argues that California's UCC applies. Since we find the California and North Carolina versions of UCC § 9-504 to be substantially similar to each other and would therefore produce the same result in this case, we do not address their arguments.

We agree with the *Glynwed* court that nothing in UCC § 9-504 absolutely precludes successor liability on the theory that a new corporation is a mere continuation of a prior debtor corporation. As the *Glynwed* court noted, this Court must not elevate form over substance, rather we must look to the substance of the transaction to determine its true nature. We reject plaintiff's suggestion that allowing a successor liability action to proceed following a 9-504 sale would violate Article 9. Instead, we note that UCC § 1-103 provides that principles of equity supplement the provisions of the UCC unless they are displaced by a particular provision. The mere continuation theory of the equitable doctrine of successor liability supplements the provisions of 9-504. We believe that neither the drafters of the UCC nor the state legislatures which enacted comparable provisions intended to elevate form over substance by providing an absolute bar against successor liability following a 9-504 sale where the new corporation is a mere continuation of the original debtor.

Since we hold that a successor liability claim is not *absolutely* barred where a secured creditor purchases the debtor's assets via Article 9, we now set forth our reasons for holding in this case that the issue of "mere continuation" should not have been submitted to the jury.

The traditional rule regarding "mere continuation" is that "a corporate successor is the continuation of its predecessor if only one corporation remains after the transfer of assets and there is identity of stockholders and directors between the two corporations." *Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 724 (N.D.Ind. 1996) (citing *U.S. v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992); *Kleen Laundry & Dry Cleaning Services, Inc. v. Total Waste Management Corp.*, 817 F. Supp. 225, 231 (D.N.H. 1993); *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 812 F. Supp. 124, 129 (N.D.Ill. 1993)). "This exception encompasses the situation where one corporation sells its assets to another with the same people owning both corporations." *Ninth Ave. Remedial Group*, 195 B.R. at 724 (citing *City Environmental, Inc. v. U.S. Chemical Co.*, 814 F. Supp. 624, 635 (E.D.Mich. 1993)). Therefore, the traditional approach emphasizes continuity of stockholders and directors between the selling and purchasing corporation. *U.S. v. Mexico Feed and Seed Co., Inc.*, 980 F.2d 478, 487 (8th Cir. 1992); *Carolina Transformer Co.*, 978 F.2d at 838.

A review of the case law reveals that North Carolina follows the traditional approach to the "mere continuation" theory. *See Bryant v.*

**G.P. PUBLICATIONS, INC. v. QUEBECOR PRINTING—ST. PAUL, INC.**

[125 N.C. App. 424 (1997)]

*Adams*, 116 N.C. App. 448, 448 S.E.2d 832 (1994), *disc. review denied*, 339 N.C. 736, 454 S.E.2d 647 (1995); *Coffin v. ISS Oxford Services, Inc.*, 114 N.C. App. 802, 443 S.E.2d 352 (1994); *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 370 S.E.2d 267 (1988). This jurisdiction also considers two factors in addition to the issue of continuity of ownership: (1) inadequate consideration for the purchase; and (2) lack of some of the elements of a good faith purchaser for value. *Id.* at 687, 370 S.E.2d at 269 (citations omitted). In fact, a purchaser conceivably could be found to be the corporate successor of the selling corporation even though there is no continuity of ownership. *See L.J. Best Furniture Distributors v. Capital Delivery Service*, 111 N.C. App. 405, 432 S.E.2d 437 (1993).

**[3]** In the instant case, the trial court instructed the jury as to the elements that make up the traditional test; however, it also provided the following instruction:

> You may also consider factors such as the following in determining whether G.P. is a mere continuation of Signal . . . whether there was a continuity of management personnel, physical location, assets and general business operations; whether there was a cessation of the ordinary business of Signal Research, Inc; whether G.P. . . . assumed the liabilities ordinarily necessary for the uninterrupted continuation of the business of Signal; whether G.P. employed many of the same employees and served many of the same customers as Signal had.
>
> <u>Not all of these factors need to be present in order for you to determine that G.P. was a mere continuation of Signal.</u> Rather, you must determine whether, under all the facts and circumstances surrounding the transactions, given the factors just set out, G.P. is a mere continuation of Signal. (Emphasis added).

We conclude that the trial court erred in its instruction to the jury regarding the elements of the "mere continuation" exception. It appears that in its charge to the jury, the trial court applied a broadened test of successorship, called the "substantial continuity" or "continuity of enterprise" test. *See Mexico Feed*, 980 F.2d at 487. The "substantial continuity" test does consider identity of stockholders and corporate officers; however, this issue is not determinative. *Id.* at 488 n. 10. This approach considers a series of factors in determining whether one corporation is the successor of another: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location;

(4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operation; and (8) whether the successor holds itself out as a continuation of the previous enterprise. *Id.* (citations omitted); *Carolina Transformer Co.*, 978 F.2d at 838 (citations omitted).

The "substantial continuity" test has evolved from the traditional "mere continuation" test "in contexts where the public policy vindicated by recovery from the implicated assets is paramount to that supported by the traditional rules delimiting successor liability." *Mexico Feed*, 980 F.2d at 487. The test has been applied in cases such as labor relations, product liability and environmental regulation. *Id.*

This broader test originated with a line of Supreme Court labor relations cases, the seminal case being *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 38 L. Ed. 2d 388 (1973). In *Golden State*, an employer sold its business after the National Labor Relations Board had found that it was guilty of an unfair labor practice in discharging an employee. In a subsequent back-pay specification proceeding, the Board held that although the purchaser was a bona fide purchaser, it should be responsible for reinstating the employee with back pay. The Ninth Circuit enforced the order and on certiorari, the Supreme Court unanimously affirmed.

The *Golden State* Court extended the traditional approach to the "mere continuation" theory of successor liability in order to further the public policy behind the National Labor Relations Act. The Court noted that

"[w]hen a new employer . . . has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations, those employees who have been retained will understandably view their job situations as essentially unaltered. Under these circumstances, the employees may well perceive the successor's failure to remedy the predecessor employer's unfair labor practices . . . as a continuation of the predecessor's labor policies."

*Golden State*, 414 U.S. at 184, 38 L. Ed. 2d at 402-03. The Court held that under these circumstances, extending liability to the successor corporation was appropriate in order to protect victimized employees, to avoid labor unrest and to prevent a deterrent effect on the exercise of rights guaranteed employees by the Act. *Id.* at 185, 38

L. Ed. 2d at 403. The Court noted that the purchaser's knowledge of pending unremedied wrongs made broadening the net of liability fair:

> Since the successor must have notice before liability can be imposed, "his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sale contract which will indemnify him for liability arising from the seller's unfair labor practices."

*Id.* (citation omitted).

Likewise, in the context of environmental cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), successor liability has been imposed under the "substantial continuation" theory. In *Carolina Transformer Co.*, 978 F.2d 832:

> [T]he children of the owner of the selling corporation owned the purchasing corporation. The father also controlled the purchasing corporation, and could write checks on the purchaser's corporate account. There was no colorable question of the purchaser's knowledge of and benefit from the seller's conduct for which CERCLA liability attached, or of the seller's and purchaser's practical identity.

*Mexico Feed*, 980 F.2d at 489. Under the traditional approach, there would have been no successor liability because there was no overlap of stock ownership between the seller and the buyer corporations. However, the court adopted the "substantial continuity" approach and held the buyer corporation liable noting that were it to hold to the contrary, "an otherwise responsible corporation could all but completely wash its hands of its environmental liability." *Carolina Transformer Co.*, 978 F.2d at 840. "Such a result," the court noted, "would not serve the remedial purpose of CERCLA, nor would it further the Congressional intent that those responsible for disposal of hazardous wastes, rather than the public, should bear the cost of remedying the pollution." *Id.*

"Even in cases of good faith, a bona-fide successor reaps the economic benefits of its predecessor's use of hazardous disposal methods, and, as the recipient of the benefits, is also responsible for the costs of those benefits." *Mexico Feed*, 980 F.2d at 487. In *Mexico Feed*, the successor corporation retained the same employees, delivered

the same service to the same clients, and kept the name of its predecessor for several years. However, the Eighth Circuit refused to impose successor liability under the "substantial continuity" test because of the lack of notice of potential liability or ties between the successor and predecessor corporations. Id. at 489-90.

In the instant case, we find that the trial court erred by applying the "substantial continuity" test rather than the more restrictive traditional test to determine whether a successor corporation is a mere continuation of its predecessor. In the context of a commercially reasonable sale under UCC § 9-504, allowing successor liability based on factors other than inadequate consideration and identity of ownership might have a chilling effect on potential purchasers who would have to be concerned that by acquiring a foreclosed business, they would also acquire liabilities they never intended to assume. While a strong public policy supports the discharge of subordinate claims after a UCC foreclosure sale, the law must not encourage the elevation of form over substance.

Quebecor cites a number of "mere continuation" cases which apply the "substantial continuity" test. *See e.g. Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir. 1993); *Fiber-Lite Corp. v. Molded Acoustical Prod. of Easton, Inc.*, 186 B.R. 603, 609 (E.D.Pa. 1994), *aff'd*, 66 F.3d 310 (3d Cir. 1995); *Glynwed*, 869 F.Supp. at 275-76. It also contends that the court's instruction as to these additional factors was appropriate based on language in *L.J. Best* in which this Court noted that a mere continuation claim might be appropriate because in addition to lack of consideration, there was evidence that the purchasing corporation leased the same trucks as the selling corporation, had the same employees, and serviced some of the same customers. *L.J. Best*, 111 N.C. App. at 409, 432 S.E.2d at 440. Nevertheless, we believe that the courts in those cases applied this broader test without appreciating the rationale behind it. *See Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1265 (9th Cir. 1990) (court refused to apply substantial continuity test because purchaser had no knowledge of seller's potential CERCLA liability); *U.S. v. Atlas Minerals & Chemicals, Inc.*, 824 F. Supp. 46, 50-52 (E.D.Pa. 1993); *Allied Corp.*, 812 F. Supp. at 129. *But see Kleen Laundry & Dry Cleaning Services*, 867 F. Supp. at 1144 (finding that a successor could be held liable under CERCLA even if it did not know that predecessor had engaged in conduct that could lead to CERCLA liability). We note that the courts in the above cases would have obtained the same result if they had applied the traditional test for mere con-

tinuation. *See Luxliner*, 13 F.3d at 74 (continuity of shareholders and officers); *Fiberlite*, 186 B.R. at 606 (continuity of management); *Glynwed*, 869 F. Supp. at 276 (continuity of officers, directors and shareholders).

Since we believe that no public policy is served by applying the "substantial continuity" test in a situation like the instant case, where a creditor purchases collateral following a § 9-504 sale and continues the debtor's business in order to recover on a delinquent loan, we conclude that the trial court should have instructed the jury only as to the elements that make up North Carolina's "mere continuation" test: Continuity of ownership, inadequacy of consideration, or lack of some of the elements of a good faith purchaser for value.

**[4]** Significantly, it is uncontroverted in the instant case that Signal does not share any common stockholders or directors with G.P. or TFSI II. Although G.P. did hire former Signal management employees, Romano, Valentino, and Bateman, there is no evidence that any of these three men played a large role in running Signal.

As to the issue of the adequacy of the consideration paid for Signal's assets, the trial court instructed the jury that they had to find that the method, manner, time, place and terms of the sale, including the price, were reasonable in order to answer "yes" to the issue of whether the sale was commercially reasonable, which it did. Since these factors were decided in G.P.'s favor, it follows that the jury's finding that G.P. was a mere continuation of Signal was based on the additional factors that make up the "substantial continuity" test.

Thus, when considered in light of the traditional "mere continuation" theory of successor liability, the uncontroverted evidence that Signal does not share any common stockholders or directors with G.P. or TFSI II combined with the jury's determination that the sale was commercially reasonable thereby answering the question of whether adequate consideration had been paid, mandates the conclusion that G.P. was not a "mere continuation" of Signal. Since the evidence fails to support a finding of mere continuation, the trial court should have granted G.P.'s motion for a directed verdict and the judgment entered by the trial court must be reversed.

Since we hold in G.P.'s favor on the issue of successor liability, we need not address its remaining assignments of error.

## QUEBECOR'S APPEAL

In its cross-appeal, Quebecor asks this Court to consider whether the trial court erred by: (I) denying its motion for relief from judgment for failing to use the proper remedy in its disposition of the "mere continuation" claim; (II) granting TFSI II's motion for directed verdict on Quebecor's successor liability claim against it; (III) improperly limiting consideration of the SEC definition of "succession" to impeachment purposes; (IV) improperly instructing the jury on the definition of "gross" and denying its motion for J.N.O.V. on the issues of commercial reasonableness and grossly inadequate consideration; (V) granting G.P.'s motion for directed verdict on its counterclaim against G.P. for unfair trade practices and denying Quebecor's motion for J.N.O.V. on the issue of damages on its counterclaim for unfair trade practices against TFSI II; (VI) denying its motion to join TFSI III as a necessary party; and (VII) granting G.P.'s motion for a stay and setting the bond at $100,000.

### I, II, III and VI

Quebecor raises several objections that pertain to its successor liability claim based on the "mere continuation" exception. Since we have already concluded that G.P. was not liable as a mere continuation of Signal, there is no need to address the merits of these issues.

### IV.

[5] Quebecor also alleged that G.P. was subject to successor liability for having paid "grossly inadequate consideration" for Signal's assets. Quebecor contends that the trial court's definition of "gross" as meaning "out of all measure, beyond allowance, or flagrant" connoted a moral element to the term, which North Carolina law rejects.

We decline to address the merits of this argument for the following reason. The trial court informed the jury that if they found that the sale of Signal's assets was commercially reasonable (and therefore the sale price was reasonable), they were not to decide whether the transfer was for grossly inadequate consideration; rather, they were to automatically answer this second issue "no." Since the jury decided that the sale was commercially reasonable, presumably they did not address the second issue of whether the transfer was for grossly inadequate consideration. Therefore, Quebecor's argument is moot.

G.P. PUBLICATIONS, INC. v. QUEBECOR PRINTING—ST. PAUL, INC.

[125 N.C. App. 424 (1997)]

V.

**[6]** At trial, Quebecor asserted claims for unfair trade practices against both TFSI II and G.P. under N.C.G.S. § 75-1.1, arising from the plaintiffs' conduct in acquiring and operating Signal's assets. The trial court granted directed verdict as to G.P. and submitted this issue to the jury only as to TFSI II. The jury found that TFSI II "wrongfully threaten[ed] one or more of the officers or director of Signal Research, Inc. with a civil lawsuit against him or them personally if the Signal Board of Directors did not agree to a friendly foreclosure" and that it "wrongfully threatened a RICO action against one or more of the officers or directors personally if the Signal Board of Directors did not agree to a friendly foreclosure." However, the jury also found that Quebecor had not been damaged as a proximate result of the unfair and deceptive conduct and awarded it nothing.

Quebecor first assigns as error the trial court's decision to grant G.P.'s motion for directed verdict. For the following reason, we affirm the trial court's decision.

A fraudulent practice claim is considered a personal tort. *See Investors Title Ins. Co. v. Herzig*, 330 N.C. 681, 688, 413 S.E.2d 268, 271 (1992). The purpose of the act is to protect the *victim* from deceptive or oppressive conduct. *Id.* at 689, 413 S.E.2d at 272. In *Chesapeake Microfilm, Inc. v. Eastern Microfilm Sales and Service*, 91 N.C. App. 539, 372 S.E.2d 901 (1988), defendants filed a counter-claim alleging deceptive and fraudulent trade practices in that the plaintiff competitor submitted low bids for contracts and then later overcharged its customers. The defendants alleged injury because the competitor secured contracts upon which defendants had also bid and because plaintiff lured away some of defendants' customers with its seemingly-lower prices. This Court held that the activity complained of provided no cause of action under Section 75-1.1, noting that "[a]ssuming defendants' allegations to be true, the *customers* of [plaintiff], if anyone, would appear to have a claim under Section 75-1.1." *Id.* at 545, 372 S.E.2d at 904 (emphasis in original).

Similarly, in the instant case, we hold that only Signal and the officers who were threatened with civil suits by TFSI II have the right to bring an action under Section 75-1.1 for the activity of which Quebecor complains. Therefore, the trial court acted appropriately in granting directed verdict for G.P.

**[7]** Quebecor next assigns as error the court's denial of its motion for judgment notwithstanding the verdict on the issue of damages. We affirm the trial court's order.

The trial court is vested with discretion to decide whether or not to set aside the jury's verdict or grant judgment notwithstanding the verdict on the issue of damages, and its decision will not be disturbed on appeal absent an abuse of that discretion. *Cole v. Duke Power Co.*, 81 N.C. App. 213, 225, 344 S.E.2d 130, 137, *disc. review denied*, 318 N.C. 281, 347 S.E.2d 462 (1986). In the case *sub judice*, the jury found that TFSI II had committed unfair trade practices but, since Quebecor was not damaged by this conduct, it was not entitled to recover damages. The jury impliedly determined that the $1.8 million paid by TFSI II for Signal's assets was fair by finding that the public foreclosure sale of Signal's assets conducted by TFSI II was commercially reasonable, and Signal's assets were not purchased by TFSI II for grossly inadequate consideration. The record indicates that the $1.8 million received from the sale of Signal's assets was insufficient to meet the debt owed to the secured creditor and there was no excess available for Quebecor as an unsecured creditor. This would have been the likely result upon sale of Signal's assets even under bankruptcy. In light of this fact, we cannot find that the trial court's refusal to set aside the jury's determination that Quebecor suffered no damages was an abuse of discretion. Accordingly, we affirm the trial court's denial of Quebecor's motion for judgment notwithstanding the verdict on the issue of damages.

We have examined Quebecor's remaining assignment of error and find it without merit.

### CONCLUSION

For the reasons set forth above, we reverse the judgment of the trial court holding G.P. liable for Signal's debt to Quebecor on the grounds that G.P. is a "mere continuation" of Signal. With regard to Quebecor's counterclaims for unfair trade practices, we affirm the trial court's order granting directed verdict for G.P. and denying judgment notwithstanding the verdict for Quebecor.

Reversed in part and affirmed in part.

Judges GREENE and MARTIN, John C. concur.