Investors Trust Co. v. Whitlock, 2015 NCBC 43.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF ORANGE | 14 CVS 1100 |

INVESTORS TRUST COMPANY,    )
                                   )
          Plaintiff,           )
                                   )
     v.                         )
                                   )
DUDLEY CARLISLE WHITLOCK;    )   **ORDER & OPINION ON MOTION TO**
JOSEPHINE WATTA; and    )   **DISMISS**
FOOTHILLS CAPITAL    )
MANAGEMENT, LLC,    )
                                   )
         Defendants.     )
                                   )
                                   )
                                   )

{1}     THIS MATTER is before the Court on Defendants Whitlock and Watta's Partial Motion to Dismiss ("Motion") made pursuant to Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, the Motion is DENIED.

> *Ellis & Winters LLP by Paul K. Sun, Jr. and Christopher W. Jackson for Plaintiff.*

> *Graebe Hanna & Sullivan, PLLC by M. Todd Sullivan and Mark R. Sigmon for Defendants.*

Gale, Chief Judge.

## I.    NATURE OF THE MOTION

{2}    Plaintiff Investors Trust Co. ("Investors Trust") and Investors Capital Management Co. ("Capital Management") initiated this action on July 30, 2014, against Defendants Dudley Carlisle Whitlock ("Whitlock"), Josephine Watta ("Watta"), and Foothills Capital Management, LLC ("Foothills Capital") and brought claims for (1) breach of fiduciary duty, (2) constructive fraud, (3) breach of

contract, (4) tortious interference with contract, and (5) unfair and deceptive trade practices ("UDTP").  The Motion is now limited to the breach of contract claims against Whitlock arising from two contracts he entered into with Capital Management before Investors Trust was formed, which are the Employment Agreement and the Non-Competition, Non-Solicitation and Non-Disclosure Agreement ("Non-Solicitation Agreement").

{3}     The matter was designated a complex business case on August 8, 2014 and assigned to the undersigned on August 11, 2014.  On October 17, 2014, Capital Management voluntarily dismissed its claims and Investors Trust voluntarily dismissed its fiduciary duty claim against Watta.  Defendants initially included the UDTP claim in their Motion, but later withdrew the Motion as to that claim.

## II.    STANDARD OF REVIEW

{4}     Defendants bring their Motion under both Rule 12(b)(1) and Rule 12(b)(6).  On a motion to dismiss pursuant to Rule 12(b)(6), the Court inquires "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008) (quoting *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987)).  The Court may grant a motion to dismiss under Rule 12(b)(6) where one of the following is true: (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.  *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985).

{5}     On a Rule 12(b)(1) motion, which may include a challenge to a plaintiff's standing, the Court may consider and weigh matters outside the pleadings.  *Tubiolo v. Abundant Life Church, Inc.*, 167 N.C. App. 324, 327, 605 S.E.2d 161, 163 (2004) (citing *Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1978)).

{6} For purposes of the Rule 12(b)(6) arguments, the Court accepts the factual allegations of the Complaint as true without assuming the veracity of Plaintiff's legal conclusions. *Walker v. Sloan*, 137 N.C. App. 387, 392, 592 S.E.2d 236, 241 (2000). In considering the Rule 12(b)(1) arguments, the Court weighs these factual allegations against the fact or absence of contradictory evidence outside of the pleadings.

## III. FACTUAL BACKGROUND

{7} The Court summarizes the following facts based on the allegations of the Complaint, except where otherwise expressly noted.

### A. The Parties

{8} Investors Trust is a chartered trust company organized under Chapter 53, Article 24 of the North Carolina General Statutes. It received its trust company charter from the North Carolina Commissioner of Banks on February 17, 2004.

{9} Capital Management was incorporated in 2003, while Investors Trust's charter application was under consideration by the Commissioner of Banks, and was created to service investment customers and initiate administrative tasks, "exclusive of trust business." (Compl. ¶ 16.) Capital Management's founders contemplated that all of its customers, employees, and operations would be transferred to Investors Trust once it received its charter.

{10} Whitlock began working for Capital Management on November 1, 2003, shortly after it was incorporated. When Investors Trust received its charter, Whitlock became an officer of Investors Trust and was named as one of its directors.

{11} Watta began working for Investors Trust in 2004, serving as an assistant secretary from 2009 until her resignation in 2014.

{12} Foothills Capital is an investment management firm that Whitlock formed while still an employee and director of Investors Trust. Foothills Capital now competes with Investors Trust and some of Investors Trust's clients have transferred their accounts to Whitlock at Foothills Capital.

## B. The Disputes

{13}     Whitlock began working at Capital Management as its Chief Investment Officer.  Whitlock signed two contracts with Capital Management: the Employment Agreement and the Non-Solicitation Agreement.  (*See* Compl. Exs. 2 ("Employment Agreement"), 3 ("N.S.A.").)

{14}     The Employment Agreement provides,

> This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives and permitted assigns.  The rights and obligations of either party hereto may not be assigned to any other party . . . without the prior written consent of the other party hereto; provided, however, that the Company[1] may assign all of its rights and obligations hereunder to an affiliated trust company at any time upon prior written notice to the Employee.

(Employment Agreement § 10.)  The Employment Agreement further states that "All notices . . . shall be deemed to have been given if sent in writing, by hand delivery, overnight delivery, or certified mail, to [the individual's] address." (Employment Agreement § 8.)

{15}     Among other provisions, the Employment Agreement required Whitlock to return all company property once his employment with Capital Management or the contemplated trust company was terminated.  (Employment Agreement § 7(b).)  Whitlock was to serve as Capital Management's Chief Investment Officer for a one-year term with renewal terms through October 31, 2013, and would also be entitled to participate in the future trust company's equity compensation plan.

{16}     The Non-Solicitation Agreement states, "The terms, promises, covenants and agreements contained in this Agreement shall apply to, be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, executors, legal representatives and assigns."  (N.S.A. § 10.)

---

[1] "Company" is defined as "INVESTORS CAPITAL MANAGEMENT COMPANY, a North Carolina corporation."  (Employment Agreement 1.)

{17} The Non-Solicitation Agreement provides, among other things, that during his employment and for three years after his termination, Whitlock will not induce any of the company's employees to terminate their employment or "call upon, solicit, divert, take away or attempt to call upon, solicit, divert or take away any customers, suppliers, business, or accounts of Company[2] or the Business[3] which were existing or potential customers of Company while Employee was employed by Company." (N.S.A. §§ 1(B), 2(A).) Whitlock also agreed not to disclose any of the company's confidential information, including

> the names, addresses and telephone numbers of past, present and prospective customers and suppliers of Company, products, concepts, inventions, devices, techniques, business plans, proposed business development, work in process, cost information, outstanding bids and bid proposals, customer requirements, contractual provisions, employee capabilities, proposed marketing initiatives, pricing information, pricing methods, company earnings, computer software and reporting systems, intellectual property, the designs, procedures, systems and business methods of Company and any other information which Company designates or treats as confidential and proprietary.

(N.S.A. § 1(C).)

{18} Investors Trust received its trust charter and began operating approximately three months after Whitlock signed the Employment Agreement and the Non-Solicitation Agreement. Whitlock was then employed by Investors Trust and became a member of Investors Trust's Board of Directors, a position he held until resigning. Whitlock served as Investors Trust's Chief Investment Officer and Chairman for Investors Trust Investment Strategy Committee, which Plaintiff alleges "placed him in an ideal position to exploit [Investors Trust's] confidential information and solicit [Investors Trust's] customers for personal gain, if he chose to do so." (Compl. ¶ 63.)

---

[2] The Non-Solicitation Agreement defines "Company" as "INVESTORS CAPITAL MANAGEMENT COMPANY, a North Carolina Corporation." (N.S.A. 1.)

[3] *See* N.S.A. 1 ("Company is engaged in the business of providing investment advice and investment management services (the 'Business') to clients throughout the United States . . . .").

{19}     Investors Trust alleges that after it received its charter, Capital Management transferred its "customers, operations, and employees, including employment agreements," to Investors Trust (Compl. ¶ 18), and that Capital Management also assigned its rights and obligations under the Non-Solicitation Agreement to Investors Trust. (Compl. ¶¶ 150, 165.) The Complaint does not further detail the method by which the assignment was effectuated or the manner in which it gave notice of the transfer to Whitlock.

{20}     Plaintiff alleges that, as a result of Whitlock's positions as Chief Investment Officer and Chairman for the Investment Strategy Committee, he learned information about Investors Trust's customer-specific investment preferences, individual customers' needs and goals, and changes in customers' risk preferences, needs, and financial circumstances over the ten years that he worked with the trust company.

{21}     The Employment Agreement allowed that Whitlock would participate in the Investors Trust Phantom Equity Compensation Plan. (Employment Agreement Ex. A; Compl. Ex. 8 ("You'll continue to participate in the phantom equity plan as per the plan document.").)

{22}     Whitlock did not separately execute a new employment agreement or a new non-solicitation agreement with Investors Trust prior to announcing his intent to retire. In late 2012, Whitlock informed Investors Trust that he intended to retire in the near future. Investors Trust and Whitlock agreed to certain terms governing employment status until retirement ("Transition Agreement"). They agreed that Whitlock would retire around December 31, 2013, but would stay on the Board of Directors until certain deferred benefits were paid. At Whitlock's request, Investors Trust agreed to effectively shorten the duration of Whitlock's Non-Solicitation Agreement to two years following his termination date. As a part of the Transition Agreement, Whitlock received a salary increase, and Investors Trust undertook the obligation to set up and maintain an office space for Whitlock in Rutherfordton, North Carolina. Plaintiff alleges that "certain terms of the Transition Agreement" were memorialized in an e-mail communication from a representative of Investors

Trust to Whitlock that Whitlock initialed on February 15, 2013. (Compl. ¶ 74.) This e-mail does not, however, reference any non-solicitation, non-competition, or non-disclosure agreement. (*See* Compl. Ex. 8.)

{23} Whitlock formed Foothills Capital on November 9, 2012, while still an employee, officer, and director of Investors Trust. On January 4, 2014, Whitlock retired from Investors Trust. Two days prior to his retirement, Whitlock directed Watta, then an Investors Trust assistant secretary, to send an email to over two hundred Investors Trust customers informing them that Whitlock was leaving Investors Trust, but that they could contact him regarding their accounts.

{24} Whitlock resigned from Investors Trust's Board of Directors on March 21, 2014. On April 14, 2014, Watta downloaded a report from the company's trust accounting management systems that "compiled highly confidential and proprietary information about every one of [Investors Trust's] existing customer accounts." (Compl. ¶ 102.) Watta resigned her employment with Investors Trust on April 15, 2014.

{25} Investors Trust advises that, as of the date it initiated this lawsuit, it has received thirty-six customer requests to transfer accounts to Foothills Capital.

{26} Investors Trust now asserts, among other things, that Whitlock breached his Employment Agreement by causing Watta to retain company property upon conclusion of their employment and "by failing to devote substantially all of his working time to the business and affairs" of Investors Trust. (Compl. ¶ 142 (internal quotations omitted) (citing Employment Agreement §§ 3, 7(b)).) Plaintiff also alleges that Whitlock has breached the Non-Solicitation Agreement by calling on customers, interfering with Watta's employment, and using Investors Trust's confidential information for personal profit. (Compl. ¶¶ 156–57, 171 (citing N.S.A. §§ 1(B)–(C)).)

## IV. ANALYSIS

{27} To state a claim for breach of contract, a plaintiff must allege "that a valid contract existed between the parties, that [the] defendant breached the terms

thereof, the facts constituting the breach, and that damages resulted from such breach." *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 608, 486 S.E.2d 443, 446 (1997).

{28}    Defendants contend that Investors Trust's Complaint has not stated a claim for breach of contract because Whitlock contracted only with Capital Management and there has been no valid assignment to Investors Trust. Whitlock admits that the Employment Agreement was assignable but denies that Investors Trust has made the requisite allegation that it was actually assigned or that required notice of assignment was provided. Whitlock contends that the Non-Solicitation Agreement was not assignable, but rather the anticipation was that Investors Trust could but did not require Whitlock to execute a new agreement. Whitlock contends that, in any event, at the least the covenant against customer solicitation in the Non-Solicitation Agreement is unenforceable because it is unreasonable as to time. In response, Investors Trust claims it is the assignee of each of the contracts. Alternatively, Investors Trust contends it may enforce the contracts as Capital Management's successor, and that if there was no valid assignment, Whitlock either ratified and modified the contracts when entering the Transition Agreement or is estopped from denying their enforcement.

### A. Investors Trust Has Alleged and Shown, Sufficient to Survive the Motion, that the Contracts Were Assignable

{29}    The Employment Agreement expressly permits Capital Management to "assign all of its rights and obligations hereunder to an affiliated trust company at any time upon prior notice to the Employee" and further states that "[i]n the event that the [Employment] Agreement is assigned to an affiliated trust company, the Employee agrees to execute a Non-Competition, Non-Solicitation and Non-Disclosure Agreement for such company." (Employment Agreement § 10.) The Non-Solicitation Agreement did not, itself, separately include an express assignment provision. It does, however, provide that "[t]he terms, promises, covenants and agreements contained in this Agreement shall apply to, be binding

upon and inure to the benefit of the parties hereto and their respective heirs, successors, executors, legal representatives and *assigns*." (N.S.A. § 10.)

{30} Whitlock argues that other language in the Non-Solicitation Agreement reflects an agreement that Investors Trust would not assert rights as an assignee but rather could, at its option, require Whitlock to enter a new non-solicitation agreement with Investors Trust. Whitlock argues then that this particular contract falls outside the rule that "a corporation generally may enforce a non-competition agreement executed by an employee of its predecessor in interest." *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 713 (M.D.N.C. 2009) (applying North Carolina law); *see also Keith v. Day*, 81 N.C. App. 185, 195, 343 S.E.2d 562, 568 (1986).

{31} The Court concludes that Investors Trust has pleaded facts—for which Whitlock has not, to date, submitted contrary evidence—that are adequate to support Plaintiff's claim that each of the contracts was assignable to it. While Investors Trust had the right to require a new contract, this right does not necessarily mandate that the initial contract was, itself, unassignable, particularly where it recites that it could be enforced by Capital Management or its successors and assigns.

{32} The Court also believes that Investors Trust has adequately alleged that the contracts were actually assigned to it. Whitlock relies on the provision in the Employment Agreement that provides a method for conclusive written notice to argue that Capital Management was required to use this particular method to provide notice of assignment, and that Investors Trust has not alleged this form of notice was given. Section 10 of the Employment Agreement allows Capital Management to "assign all of its rights and obligations [t]hereunder to an affiliated trust company at any time *upon prior notice to the Employee*." (Employment Agreement § 10.) Section 8 of the Employment Agreement provides that "[a]ll notices . . . shall be deemed to have been given if sent in writing, by hand delivery, overnight delivery or certified mail to [Whitlock's] address." (Employment Agreement § 8.) Investors Trust pleads generally that "Capital Management

exercised the assignment provision in the Employment Agreement; it gave [actual] notice to Whitlock and assigned its rights and obligations under the Employment Agreement to [Investors Trust]." (Compl. ¶ 30.) Whitlock has not offered evidence that he received no notice, and the pleadings are adequate to support the inference that he was aware that his employment contract had been assigned. The Court does not believe it should, at least at the initial pleadings stage, conclude that notice consistent with Section 8 of the Employment Agreement was the only form of notice that would be effective to satisfy Section 10 of the agreement.

{33}    In sum, Investors Trust has adequately pleaded that each of the contracts was assignable and assigned, and the Complaint should not be dismissed under either Rule 12(b)(1) or Rule 12(b)(6) on the basis that Investors Trust has no contract with Whitlock that it has standing to enforce.

B. <u>Investors Trust Has Stated Colorable Alternative Claims that It May Enforce the Contracts as Capital Management's Successor or that Whitlock Either Entered a New Contract with Investors Trust or Should Be Estopped from Denying Investors Trust's Right to Enforce</u>

{34}    While the Court's ruling above may be dispositive as to whether Investors Trust may enforce the contracts, the Court will address Investors Trust's alternative arguments briefly.

{35}    Investors Trust first claims that even if the contracts were not assigned to it, it may nevertheless enforce the contracts as a successor to Capital Management. The issue of whether contracts are effective as to a successor more often arises in the context of whether the successor can be charged with the predecessor's liabilities. In North Carolina, "[a] corporation which purchases all, or substantially all, of the assets of another corporation is generally not liable for the old corporation's debts or liabilities." *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 687, 370 S.E.2d 267, 269 (1988). An exception to this general rule, referred to as the "mere continuation" doctrine, may arise when an entity acquires another entity through an asset sale, but carries on the second entity's business essentially as did the predecessor. In such a circumstance, the purchasing entity

may be "a 'mere continuation' of the selling corporation in that the purchasing corporation has some of the same shareholders, directors, and officers" and "if only one corporation remains after the transfer of assets." *G.P. Publ'ns, Inc. v. Quebecor Printing-St. Paul, Inc.*, 125 N.C. App. 424, 433, 434, 481 S.E.2d 674, 679, 680 (1997). The mere continuation test was "put in place to prevent fraudulent transfers in private sales." *Joyce Farms, LLC v. Van Vooren Holdings, Inc.*, ___ N.C. App. ___, 756 S.E.2d 355, 360–61 (2014). The inquiry is fact intensive, and a court must be cautious not to extend this exception beyond narrow facts.

{36}    Here, Investors Trust seeks the benefit of being able to enforce contracts as a successor, in contrast with a claim that it can be charged with its predecessor's liabilities. The circumstances of this case are sufficiently unusual to counsel against an early dismissal on the pleadings of the claim that Investors Trust cannot enforce the contracts as Capital Management's successor absent an effective actual assignment. The contracts with Capital Management expressly anticipated that the new entity was being formed and that the continual implementation and engagement of benefits from the contracts would be with the company not yet chartered. The Court is not, however, expressing an opinion that a more-developed record would justify a finding that Investors Trust has contract rights as Capital Management's successor.

{37}    Investors Trust has raised two additional alternative bases for enforcing the contracts if they were not actually and effectively assigned. First, Investors Trust argues that the parties formed a new contract when agreeing to modify the terms of the initial contracts by entering into the Transition Agreement. Second, Investors Trust asserts that Whitlock should be estopped from denying that he had a non-solicitation agreement with Investors Trust because he implicitly recognized that Investors Trust could enforce that contract when requesting and securing Investors Trust's agreement that the post-termination restrictive period be shortened from three years to two. Each of these arguments will require a clear evidentiary foundation. While the Court need not rule on the validity of either of these two alternative theories, as it has determined that the contract claims can

proceed on other bases, the Court shares questions it noted when reviewing the arguments. As to the first argument, the Court questions whether an enforceable new agreement was documented by an adequate writing, and as to the estoppel argument, the Court is not presently aware of case precedent supporting the use of equitable estoppel under similar circumstances.

{38} In sum, the Court is not required to find that the alternative arguments Investors Trust asserts will succeed. Rather, the Court has indicated that it believes it would be appropriate to deny the Motion at the early pleading stage even in the absence of an adequate allegation that each of the contracts was actually validly assigned to Investors Trust.

C. <u>Further Factual Inquiry Is Required Before Determining that the Customer Non-Solicitation Clause Is Overbroad</u>

{39} Covenants not to compete, including covenants not to solicit, are enforceable if: "(1) in writing, (2) made part of a contract of employment, (3) based on valuable consideration, (4) reasonable both as to time and territory, and (5) not against public policy." *Wade S. Dunbar Ins. Agency, Inc. v. Barber*, 147 N.C. App. 463, 468, 556 S.E.2d 331, 335 (2001) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649–50, 370 S.E.2d 375, 380 (1988)). The covenant must not be broader than necessary to protect an employer's business interest. *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989).

{40} The Motion frames its primary attack on the covenant against customer solicitation as an argument that the covenant is unreasonable as to time because the effective period it covers must be determined to be the entire ten years of Whitlock's employment plus the two years following the termination of his employment. Defendants argue that this is the proper application of the "look-back" analysis followed in *Farr Assocs., Inc. v. Baskin*, which held that when a restrictive covenant "reaches back to include clients of the employer during some period in the past, that look-back period must be added to the restrictive period to determine the real scope of the time limitation." 138 N.C. App. 276, 280, 530 S.E.2d 878, 881

(2000). The Court is not aware of a case in which a look-back analysis has been employed where the covenant is tailored so as to be limited to customers with which the departing employee dealt.

{41} The covenant here, however, is not so tailored. It prohibits Whitlock, for a period of two years after his termination, from soliciting "any customers, suppliers, business, or accounts of Company or the Business which were existing or potential customers of Company while [Whitlock] was employed by Company." (N.S.A. § 1(B); Compl. ¶ 72.) However, the Court believes, at least under the facts of this case, the more controlling question is not whether the covenant "looks back" to the entire period of employment, but rather whether the covenant's extension beyond customers with which Whitlock dealt becomes unreasonable because it extends beyond the scope necessary to protect Investors Trust's legitimate business interest. *See Whittaker*, 324 N.C. at 528, 379 S.E.2d at 828. That inquiry is compounded by the fact that the covenant purports to extend to "potential customers."

{42} In certain cases, however, the balance between an employer's legitimate interest and the scope of a restrictive covenant may require factual inquiry beyond the pleadings and the face of the agreement. Clearly, the employer's burden to demonstrate a necessity to protect its legitimate interests increases as the scope of the covenant increases. In many instances, the scope of the covenant may be so broad compared to the employee's role that no further inquiry is needed. Here, however, reading the Complaint liberally, Whitlock was intimately involved in all phases of Investors Trust's business from its inception and had access to its entire range of sensitive information, including, but not limited to, information regarding customers with which he may have dealt directly. As such, the Court believes it appropriate to defer determination of whether there is a proper and reasonable balance between Investors Trust's legitimate business interest and the scope of the customer non-solicitation restriction.

{43} It is then, likewise, premature to determine whether blue penciling can be effectively used to cure any overbreadth. In North Carolina, "[a] court at most

may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, ___ N.C. App. ___, 762 S.E.2d 316, 321 (2014) (quoting *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 317, 450 S.E.2d 912, 920 (1994)); *see also Whittaker*, 324 N.C. at 528, 379 S.E.2d at 828 ("If the contract is separable, however, and one part is reasonable, the courts will enforce the reasonable provision."). Perhaps the Court could, at this stage, use this tool if the only necessity would be to strike the words "or potential" from the covenant. But, the Court's concern regarding the covenant's breadth is greater, and to the extent the language must be actually rewritten to avoid overbreadth, blue penciling would not be proper.

{44}    In sum, the Court finds that Defendants have raised serious questions as to the scope of the covenant against customer solicitation arising from the extraordinarily broad language the covenant employs, but there are further facts that should be considered before the Court's determination of whether the scope is unreasonable in a manner that cannot be cured, so that the validity of the covenant should not be determined on an early motion to dismiss.

## V.    CONCLUSION

{45}    For the foregoing reasons, Defendants' Partial Motion to Dismiss is DENIED.

IT IS SO ORDERED, this the 1st day of May, 2015.