# Illinois Official Reports

## Appellate Court

---

*Advocate Financial Group, LLC v. 5434 North Winthrop, LLC,*
2014 IL App (2d) 130998

---

| | |
|---|---|
| Appellate Court Caption | ADVOCATE FINANCIAL GROUP, LLC, Plaintiff-Appellee, v. 5434 NORTH WINTHROP, LLC; JAMES CARTWRIGHT; WILLIAM CARTWRIGHT; BERNARD BOTHEROYD; WILLIAM SEVERINO; HARRY POWELL; CONNIE POWELL; MICHAEL PROKOP; THERESA McLAUGHLIN; SYNTHIA STRYZEK; MARGARET HANEY; ANN BRENSEN; and BARBARA PALMER, Defendants (Steward Apartments, Citation Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-13-0998 |
| Filed | August 5, 2014 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action to enforce the judgment plaintiff obtained against defendant corporation based on defendant's default on a "working agreement" under which plaintiff assisted defendant in the conversion of a residential building to condominiums, the appellate court vacated the turnover order the trial court entered against citation respondent, a corporation that purchased the building from an entity that had purchased it from defendant, notwithstanding the trial court's holding, pursuant to the "mere continuation" exception to the general rule that a corporation purchasing the assets of another corporation is not liable for the other corporation's debts, that the citation respondent was responsible for defendant's debts as the "mere continuation" of defendant corporation, which was involuntarily dissolved, since the issue of fraud in connection with the transfer of the building to a "middleman" and then to citation respondent was intertwined with the issue of whether the transactions were "*bona fide*" and the trial court failed to make a specific finding in that regard; therefore, the cause was remanded to the trial court for reconsideration and the entry of an appropriate judgment. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-L-87; the Hon. Ronald D. Sutter, Judge, presiding. |
| Judgment | Vacated and remanded. |
| Counsel on Appeal | Anthony S. DiVincenzo, of DiVincenzo Schoenfield Swartzman, of Chicago, for appellant.<br><br>Peter H. Jagel, of Law Offices of Peter H. Jagel, P.C., of Naperville, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion.<br>Justice Hutchinson concurred in the judgment and opinion.<br>Justice Jorgensen dissented, with opinion. |

## OPINION

¶ 1 Plaintiff, Advocate Financial Group, LLC, obtained a judgment against 5434 North Winthrop, LLC (North Winthrop), a corporation that had been dissolved. North Winthrop's sole asset, a residential building in Chicago (Chicago property), had been sold to a purchaser that later resold it to Steward Apartments, LLC (Steward). To satisfy its judgment against North Winthrop, plaintiff sought a turnover order against Steward (see 735 ILCS 5/2-1403 (West 2010)). After a trial, the trial court granted the order, holding that, as the "mere continuation" of North Winthrop, Steward was responsible for its debts. Steward appeals, contending that the court misapplied the "mere continuation" exception to the general rule that a corporation that purchases the assets of another corporation is not liable for the other corporation's debts. We vacate and remand.

¶ 2 North Winthrop was formed to develop the Chicago property and sell condominium units there. Its "Operating Agreement," dated December 21, 2006, listed its members and their respective interests as James and William Cartwright, brothers, who were also managers (7.65% each); Bernard Botheroyd (15.4%); William Severino (15.4%); Harry and Connie Powell jointly (7.7%); Michael Prokop (7.7%); Theresa McLaughlin and Synthia Stryzek jointly (15.4%); Margaret Haney (15.4%); and Ann Brensen and Barbara Palmer jointly (7.7%). In 2007, National City Bank, the predecessor to PNC Bank, National Association (PNC), lent North Winthrop $1,662,000, secured by a mortgage on the property, with most of North Winthrop's members personally guaranteeing the loan. Later, North Winthrop defaulted on the loan, and PNC started foreclosure proceedings.

¶ 3 On January 15, 2010, plaintiff and North Winthrop entered into a "working agreement" under which plaintiff would assist North Winthrop in obtaining financing to pay off PNC and complete the project. On December 23, 2011, North Winthrop and PNC signed a settlement under which PNC released North Winthrop from the mortgage, released the personal guarantors from most of their obligations as such, and reduced North Winthrop's debt to $750,000. In return, North Winthrop agreed to sell the property to CSM Capital, LLC (CSM). On December 30, 2011, the sale closed for $650,000. CSM took title in the name of Winthrop Real Estate, LLC (Winthrop Real Estate). On June 8, 2012, North Winthrop was involuntarily dissolved.

¶ 4 On March 6, 2012, Steward filed its operating agreement with the Secretary of State's office. It stated that the company had been formed "to own and operate" the Chicago property. It listed the members and their respective interests as James Cartwright (17.99%); William Cartwright (11.65%); Botheroyd (14.31%); Prokop (10.32%); Haney (30.22%, including 15.11% transferred from McLaughlin); and Brensen and Palmer jointly (15.51%). On March 19, 2012, Winthrop Real Estate and Steward closed the sale of the property for $676,008.20. Winthrop Real Estate agreed to lend Steward $400,000 to complete the project.

¶ 5 In the meantime, plaintiff had obtained an arbitration award against North Winthrop for unpaid fees under the working agreement. On September 7, 2011, plaintiff filed an amended complaint to confirm the award, naming North Winthrop and its individual members as defendants. On October 11, 2012, after North Winthrop had been dissolved, the trial court entered judgment for plaintiff and against North Winthrop, but not the individual defendants, for $50,896.23 for plaintiff's services and $36,550 in attorney fees.

¶ 6 On February 7, 2013, plaintiff moved for a turnover order against Steward, claiming that Steward was liable for North Winthrop's judgment debt because Steward was the "mere continuation" of North Winthrop. Plaintiff observed that North Winthrop's sole asset–the eponymous Chicago property–was also Steward's sole asset. Further, most of North Winthrop's members were now members of Steward, and every member of Steward had been a member of North Winthrop. Citing *Dearborn Maple Venture, LLC v. SCI Illinois Services, Inc.*, 2012 IL App (1st) 103513, and *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 111410, plaintiff contended that this case fit within an exception to the rule that a corporation that purchases another corporation's assets is not liable for the other corporation's debts.

¶ 7 In response, Steward argued as follows. North Winthrop sold the Chicago property in order to satisfy its settlement with PNC. The sale to CSM/Winthrop Real Estate, for $650,000, was an arm's-length transaction between unaffiliated entities: no member of North Winthrop had any interest in Winthrop Real Estate. On December 30, 2011, when the sale closed, the guarantors of the PNC note were required to contribute an additional $140,000 to pay off the note. Steward could not be North Winthrop's "mere continuation," because North Winthrop sold the building to CSM/Winthrop Real Estate, an independent corporation, and, sometime later, CSM/Winthrop Real Estate voluntarily sold the building to Steward. The "mere continuation" doctrine applies only to direct transfers of assets; no case law holds that one corporation can be the mere continuation of another where the assets of the first corporation were acquired and then resold in arm's-length transactions by an independent entity.

¶ 8        The parties agreed that an evidentiary hearing was needed to resolve the dispute. At the hearing, the sole witness was James Cartwright, through whose testimony several exhibits were admitted into evidence. On examination by plaintiff's attorney, Cartwright testified as follows. In December 2006, North Winthrop was formed in order to purchase the Chicago property, with the aim of rehabilitating it and selling condominium units. North Winthrop conducted no business other than owning and developing the property. After the tenants' leases expired, North Winthrop did not renew any of them. It obtained a construction loan from National City for approximately $1.5 million. PNC bought out National City and acquired the interest in the loan. In 2008, when the real-estate and financial markets declined, PNC required an additional $300,000 in order to continue to finance the loan. The Cartwrights took out a separate loan.

¶ 9        Cartwright testified that, late in 2008, PNC stopped funding the project altogether. North Winthrop found out that CSM might be able to provide capital to get the project restarted. North Winthrop's members were concerned about completing the project, and the Cartwrights, Harry Powell, McLaughlin, Stryzek, and Haney were also concerned about "get[ting] off the guarantees" they had made to PNC. Shown the December 23, 2011, settlement with PNC, Cartwright agreed that his dealings with CSM would have begun before that date. CSM bought the building, and, as part of the settlement, several of North Winthrop's members paid PNC $140,000 to "get off the guarantees." Shown the contract between North Winthrop and CSM, Cartwright acknowledged that it stated that the parties had entered into it in May 2011, although the closing took place on December 30, 2011. After the closing, North Winthrop "stopped functioning. There was [*sic*] no assets." North Winthrop and its members "were completely finished with [CSM]."

¶ 10       Cartwright testified that he and William were the managing members of Steward. He explained the origins of Steward. Early in 2012, Winthrop Real Estate (formerly CSM) was having difficulty obtaining permits and a water meter. Joe Capicious, Cartwright's long-time acquaintance, asked him whether "we" were interested in continuing to develop the Chicago property, because "we had the permits in place. We had the wherewithal with the City to get things like the water meter." Cartwright agreed with plaintiff's attorney that "the City basically let Steward jump into the place of *** North Winthrop."

¶ 11       Cartwright also agreed with plaintiff's attorney that Steward was formed with one purpose: to regain ownership of the property. He also agreed that part of his motivation was to "salvage the money [he] had already put into the project." On March 19, 2012, Steward signed the contract buying the property from Winthrop Real Estate for $676,008.20. Shown a provision in the contract referencing a title commitment from a title insurer, effective January 9, 2012, Cartwright testified that he did not know anything about the commitment; he had signed the contract but had not read it first. Although the contract stated that the purchaser would pay a $210-per-day penalty if the closing occurred after March 2, 2012, he did not recall Steward paying any such penalty.

¶ 12       Cartwright testified that the deed of sale was dated March 8, 2012. He did not attend the closing and did not personally remember when it occurred. The closing statement recited that "CSM Capital" would lend Steward $400,000 to complete the construction and that the purchase was contingent on Steward obtaining financing before the closing. Steward obtained financing, repaid the loan, and, in February 2013, refinanced the project through Signature Bank.

¶ 13        On examination by Steward's counsel, Cartwright testified as follows. After PNC settled with North Winthrop in the foreclosure case, North Winthrop sold the property to CSM/Winthrop Real Estate for $650,000. North Winthrop also raised $140,000 to "get off the guarantees" for the debt to PNC. North Winthrop had no ownership interest in CSM/Winthrop Real Estate; to Cartwright's knowledge, neither did any of North Winthrop's individual members. By settling the foreclosure case and selling the property, North Winthrop and the guarantors saved approximately $1.1 million. No sale proceeds were distributed to any members of North Winthrop. After the sale, North Winthrop had no assets and conducted no further business.

¶ 14        Cartwright testified that, on March 5, 2012, he signed the contract of sale from Winthrop Real Estate to Steward. On March 6, 2012, he signed the operating agreement for Steward. Before March 2012, Capicious had approached Cartwright about a possible sale, and several former members of North Winthrop had agreed to participate. When the original sale by North Winthrop to CSM/Winthrop Real Estate closed, there was no "agreement in place" to resell the property to any entity connected with Cartwright.

¶ 15        On reexamination by plaintiff, Cartwright stated that, when he first met with Capicious, the project was "in distress." Capicious told Cartwright that he was a member of CSM. Capicious became Cartwright's contact, and eventually CSM approved the sale from North Winthrop to CSM. Cartwright did not know whether CSM had obtained an appraisal for the property before the closing; he "would imagine [it] did." Within 45 days of buying the property, CSM/Winthrop Real Estate contacted Cartwright about a possible resale; Cartwright "jumped on that as soon as they agreed to it," in part to salvage the money he had already put into the project. Steward was formed with the Cartwrights as managers; some, but not all, of North Winthrop's former members were members of Steward. Steward's purpose in buying the property was the same as North Winthrop's had been: to rehabilitate it and convert it to condominiums, sell it, or continue to own it as an investment.

¶ 16        The parties rested. The trial court admitted the exhibits about which Cartwright had testified. In its closing argument, plaintiff contended in part that Steward was liable for North Winthrop's debts because Steward was a mere continuation of the defunct corporation. Plaintiff noted that the members of the two corporations were almost identical; the only difference was that a few members of North Winthrop were not members of Steward. Further, plaintiff noted that the corporations owned the same asset, the Chicago property, and no other property, and that they had the same purpose for owning that asset. Plaintiff also contended that there was evidence that the two transactions were not arm's length and were instead a single scheme to enable North Winthrop to avoid its debts; plaintiff noted how soon one sale was followed by the other and that the title commitment for the second sale had been obtained only days after the first sale.

¶ 17        In response, Steward contended that plaintiff's fraud argument was a new theory that it had not raised in the motion for a turnover order. Not only was fraud unproven, Steward maintained, but, as a matter of law, the facts did not fit the mere-continuation doctrine. In all opinions applying the doctrine, there had been a direct transfer of assets from corporation A to corporation B, which had the same, or nearly the same, ownership (or a series of such transfers between essentially identical entities). Here, by contrast, there was an intervening arm's-length transfer from corporation A to corporation C, which was free to hold onto the asset or transfer it in any way that it wished, followed by an arm's-length transfer from C to

B. There was no sale from A to B, and the intervening two sales were not a sham or a scheme to defraud creditors. North Winthrop had sold the property to CSM/Winthrop Real Estate in order to settle its foreclosure suit with PNC on terms beneficial to both; in turn, CSM/Winthrop Real Estate had sold the property to Steward because it discovered that it could not develop the property on its own.

¶ 18   In reply, plaintiff argued that even before the first sale, from North Winthrop to CSM/Winthrop Real Estate, there had been negotiations that eventually culminated in the sale of the property from CSM/Winthrop Real Estate to Steward, a corporation that was essentially identical to North Winthrop. Further, even if there was no prearranged double-sale, Steward was liable to plaintiff because it was the mere continuation of North Winthrop.

¶ 19   The trial court ruled in plaintiff's favor. The court explained as follows. Plaintiff had obtained a judgment against North Winthrop for a debt. The issue was whether Steward could be held liable for the judgment. The sale from North Winthrop to CSM/Winthrop Real Estate closed in late December. Within "a matter of days," a title commitment had been obtained for a sale of the property to Steward. Cartwright had testified that one of the main purposes of the first sale was to remove his and other members' personal liability as guarantors of the PNC loan to North Winthrop. Capicious then approached Cartwright with the proposal that CSM/Winthrop Real Estate sell the property to several former members of North Winthrop. The court continued:

> "So the argument really today is that this falls under an exception to [the] general rule of successor corporate nonliability. The exception brought up here is the mere continuation exception.
>
> The mere continuation exception applies when the purchasing corporation is merely a continuation or reincarnation of the selling corporation. ***
>
> In other words, the purchasing corporation maintains the same or similar management and ownership but merely wears different clothes. The test used to determine whether one corporate entity is a continuation of another is whether there is a continuation of the corporate entity of the seller, not whether there is a continuation of the seller's business operation. A common identity of officers, directors, ownership and stocks *** is a key element of what constitutes a continuation. However, the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporations.
>
> Well, I think in this case, the evidence shows that we have all those requirements. And then the only issue in my mind *** is whether this sale to what I would call kind of the middle man of CSM, whether that somehow changes the exception to the rule and makes it nonapplicable [*sic*] under these facts. I don't think it does."

¶ 20   Steward moved to reconsider the judgment, arguing that the mere-continuation doctrine did not apply, because North Winthrop had sold its sole asset not to Steward but to an independent third party that was under no obligation to sell the property to Steward or anybody else. After hearing arguments, the court declined to reconsider its ruling. It explained:

"[W]hile [this case] does not involve a direct transfer, there was that threat [*sic*] of continuity, and we had [North Winthrop] \*\*\* and then we have exactly the same group minus two or three or some members for [Steward] \*\*\*. We have the continuity of the property itself. \*\*\* And the cases that were cited did involve more of a direct transfer, but I don't see frankly a different outcome because there was in effect a middle man \*\*\*. \*\*\* [E]specially in light of the facts involving the title commitment and that was right there, right \*\*\* within a matter of days \*\*\*."

¶ 21    Steward timely appealed. On appeal, Steward contends that the mere-continuation exception to the rule of corporate successor nonliability does not apply when the two corporations do not engage in a direct transaction but, instead, the first corporation transfers its assets to a separate entity, which, in turn, voluntarily transfers the assets to the second corporation. Therefore, according to Steward, the trial court erred as a matter of law in holding it responsible for plaintiff's judgment against North Winthrop.

¶ 22    As we will explain below, our reading of the record leads us to conclude that the trial court did not make a finding on the *bona fides* of CSM's involvement. Contrary to the dissent's position, we do not believe that there is a factual issue to review; rather, we seek to articulate and clarify the law to be applied on remand. Accordingly, we will apply the *de novo* standard of review and not the manifest-weight-of-the-evidence standard suggested by the dissent. See *City of Champaign v. Torres*, 214 Ill. 2d 234, 241 (2005).

¶ 23    We begin with the applicable law. As a general rule, a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation. *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45 (1997). The rule is based in part on " 'the need to protect bonafide purchasers from unassumed liability' " (*id.* at 345 (quoting *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 623 (8th Cir. 1981))) and " 'to maximize the fluidity of corporate assets' " (*id.* (quoting *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990))). There are four recognized exceptions to the rule: "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely the continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Id.*

¶ 24    Here, the trial court held that the third exception, where one corporation is the "mere continuation" of another, applied. The trial court did not rely on the fourth exception, where a sale is to defraud creditors. Although plaintiff argued for the application of the fraud exception, the trial court did not find that either of the two sales, or the two sales considered as one scheme or transaction, had a fraudulent purpose. The court did note facts that might have supported that finding, but it based its decision on the mere-continuation doctrine. We thus turn to the case law.

¶ 25    Although successor corporate nonliability is "the 'general rule in the majority of American jurisdictions' " (*id.* (quoting *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir. 1977))) and the four exceptions are "equally recognized in most American jurisdictions" (*id.*), the parties' briefs have confined their citations of authority to Illinois law. The problem is that the facts of this case do not resemble those in the Illinois opinions. Thus, Steward points out that no Illinois opinion has applied the mere-continuation doctrine to facts comparable to those here. Plaintiff responds that no Illinois opinion has held that the doctrine

does not apply to facts comparable to those here. Both parties are correct. Because we may consider foreign authority for its persuasive value when Illinois authority is inconclusive (*Rhone v. First American Title Insurance Co.*, 401 Ill. App. 3d 802, 812 (2010)), we first turn to Illinois authority, then examine foreign authority for assistance.

¶ 26    The mere-continuation exception to the rule of successor nonliability applies when the purchasing corporation "maintains the same or similar management and ownership, but merely wears different clothes. [Citations.]" (Internal quotation marks omitted.) *Vernon*, 179 Ill. 2d at 346. The test is not whether the seller's business operation continues in the purchaser, but whether the seller's corporate entity continues in the purchaser. *Id.* The key consideration is whether there is identity of ownership, based on identity of officers, directors, and stockholders. *Id.* at 346-47; *Workforce Solutions*, 2012 IL App (1st) 111410, ¶ 87. However, the distribution of the ownership of shares in the new corporation need not be identical to that in the old corporation. *Workforce Solutions*, 2012 IL App (1st) 111410, ¶ 88.

¶ 27    We can say that, had there been a direct transfer of assets from North Winthrop to Steward, the latter would have been responsible for the former's debt to plaintiff. Steward's shareholders are substantially similar to North Winthrop's; although several former shareholders dropped out, no new ones came aboard, and Steward's shareholders had held a majority interest in North Winthrop. Moreover, both corporations were managed by the Cartwright brothers. Therefore, the requisite continuity existed between North Winthrop and Steward. See *id.*; *Dearborn Maple Venture*, 2012 IL App (1st) 103513, ¶ 39.

¶ 28    The problem, of course, is that Steward did not simply purchase North Winthrop's sole asset. The only transfers in this case were (1) North Winthrop's sale of its asset to CSM/Winthrop Real Estate; and (2) CSM/Winthrop Real Estate's sale of the same asset to Steward. Plaintiff does not claim that CSM/Winthrop Real Estate was the "mere continuation" of North Winthrop or that Steward was the "mere continuation" of CSM/Winthrop Real Estate. That claim would fail, because there was no identity of ownership either way; CSM/Winthrop Real Estate was independent of both North Winthrop and Steward. Had the trial court held that CSM/Winthrop Real Estate was a "straw man" that North Winthrop used to evade its creditors, it could have applied the fraud exception to the rule of successor nonliability to enable plaintiff to recover against Steward. However, although there are hints of such reasoning in the court's comments, it specifically relied solely on the mere-continuation exception and did not find a fraudulent purpose behind the transactions.

¶ 29    Therefore, Illinois law leaves open the real issue in this case: does the mere-continuation doctrine apply when two corporations are essentially identical, the first corporation transfers its assets to an intermediate purchaser, and the intermediate purchaser then transfers the assets to the second corporation? Steward is correct that courts' phrasing of both the rule of successor nonliability and the mere-continuation exception appears to assume a direct transfer from the original corporation to the alleged continuation. However, although the cases speak of "a corporation that purchases the assets of another corporation" (*Vernon*, 179 Ill. 2d at 344-45) and an exception to the rule when "the purchaser is merely a continuation of the seller" (*id.* at 345; see also *Nilsson v. Continental Machine Manufacturing Co.*, 251 Ill. App. 3d 415 (1993)), they do not speak of a corporation that "*directly* purchases the assets of another corporation." In any event, as we will explain below, not only is the presence of an

intermediate purchaser relevant to our inquiry, the nature of the intermediate purchaser's involvement must also be considered.

¶ 30    As important, in the cases that the parties cite and the other Illinois cases that we have found, the issue was always the effect of a direct transfer from one corporation to its alleged continuation. No Illinois opinion addresses how to apply the successor-nonliability rule, or how (and whether) the mere-continuation exception applies, to the fact pattern here. We therefore turn to foreign authority to see what light can be shed on a case in which the original corporation transfers its assets not to its alleged "mere continuation" but instead to a third party, which then transfers the assets to the alleged corporate clone.

¶ 31    There is authority that the use of an intermediary to transfer assets from the predecessor to its corporate clone will not automatically bar the application of the mere-continuation doctrine. See, *e.g.*, *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 651 (5th Cir. 2002). In *Patin*, however, not only were the two corporations owned and controlled by the same people, but the intermediaries were as well. *Id.* at 651 n.14. The court did state, "[T]he fact that a transfer of assets involves an intermediary rather than a direct transfer from predecessor to successor does not necessarily preclude application of the mere continuation exception, particularly when the intermediary is under the control of or otherwise tied to the principals in both the predecessor and successor corporations." *Id.* at 651. However, this cautious statement must be taken in the context of a case in which the intermediary was indeed so controlled. In *Patin*, the intermediaries did not break any continuity of ownership or control in the transfer process. There was simply more than one mere continuation, and declining to apply the exception would have exalted form over substance in a most obvious way, thereby practically sanctioning a fraud.

¶ 32    *Patin*'s quoted passage cites *Ed Peters Jewelry Co. v. C&J Jewelry Co.*, 124 F.3d 252 (1st Cir. 1997). In *Ed Peters*, the plaintiff sought to recover an unsecured debt incurred by the original corporation, Anson. Anson became insolvent and worked out an arrangement with Fleet, its secured creditor. Under the arrangement, Fleet instituted foreclosure proceedings, Anson was dissolved, and, at the private foreclosure sale, Anson's assets were purchased by a new company, C&J, that was owned and controlled by Anson's former owners and continued Anson's business operations. Fleet financed part of the purchase price. The district court ruled that, as a matter of law, the plaintiff could not recover from the new corporation. *Id.* at 257-58.

¶ 33    The First Circuit reversed, holding in part that the plaintiff had raised a factual basis for holding C&J liable for Anson's debts. The court noted existing case law (some of which we discuss later) "overwhelmingly confirm[ing] that an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability." *Id.* at 267. The plaintiff had raised a factual issue of whether C&J simply was "Anson in disguise." *Id.* Thus, "the fact that C&J acquired the Anson assets indirectly through Fleet, rather than in a direct sale from Anson, [did] not trump the successor liability doctrine as a matter of law, since equity is loath to elevate the form of the transfer over its substance." *Id.* at 268.

¶ 34    *Ed Peters* is dissimilar to the present case in that there the plaintiff had raised the factual possibility that the two transfers, from Anson to Fleet and then from Fleet to C&J, were in reality parts of one integrated transaction arranged in advance by both the owners of the two corporations *and* the ostensibly independent third party. In that scenario, it would indeed be placing form ahead of substance to regard the independent third party as anything more than

a facilitator of the ultimate transaction–from the original corporation to its clone. By prearrangement, the simple transfer was undertaken in stages.

¶ 35    *Ed Peters* cited, in part, *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F. Supp. 265 (D.N.J. 1994). *Ed Peters*, 124 F.3d at 267. However, as in *Ed Peters*, in *Glynwed*, even before the successor corporation came into existence, the foreclosing creditors took an active role in arranging the transfer of assets from the original corporation to the successor corporation. See *Glynwed*, 869 F. Supp. at 267-68. Thus, the two transactions were part of one prearranged and foreordained transfer of assets, with the intermediary committed in advance to the transfer. The intermediary was not independent of the two corporations–it was in essence a broker.

¶ 36    In *G.P. Publications, Inc. v. Quebecor Printing-St. Paul, Inc.*, 481 S.E.2d 674 (N.C. Ct. App. 1997) (cited in *Ed Peters*, 124 F.3d at 267), the original corporation's secured creditor held a foreclosure sale at which it was the sole bidder. It acquired the original corporation's assets and then transferred those assets to a new corporation that it had launched. *G.P. Publications*, 481 S.E.2d at 676-77. The appellate court held that the new corporation could be liable to the old corporation's unsecured creditor in a declaratory judgment action over a debt, given the continuity of ownership between the old corporation and the new one. *Id.* at 680-81.

¶ 37    Although the *G.P. Publications* court was concerned primarily with the definition of a successor or a mere continuation (*id.*), it nonetheless recognized that the mere-continuation doctrine could apply even with an intermediary routing the assets from the old corporation to the new one. Again, however, the third party was anything but independent of the two corporations; while it had no overlap of ownership or control with the original corporation (although it was its creditor), it created the new corporation with the assets that it had obtained through the foreclosure sale (*id.* at 677).[1]

¶ 38    Unfortunately, here, the trial court did not consider whether the intervening sale, unlike the foreclosure sales in the preceding cases, was a mere mechanism for arranging a transfer from the original corporation to the corporate clone with the intermediary's conscious participation from the start. If not, then the foregoing authority is not on point. Conversely, if the intermediate transfer was not a *bona fide* transaction, authority suggests that the mere-continuation exception would apply (indeed, such facts might be a basis to invoke the fraud exception as well).

¶ 39    In *Comstock v. Great Lakes Distributing Co.*, 496 P.2d 1308 (Kan. 1972), the plaintiff recovered a judgment against Vulcan, the manufacturer of an allegedly defective automobile jack, for personal injuries. The issue on appeal was whether he could recover against Great Lakes, on a theory that it was the mere continuation of Vulcan. After manufacturing the

___

[1]Also, in *Continental Insurance Co. v. Schneider, Inc.*, 873 A.2d 1286 (Pa. 2005), the court recognized that cases from other jurisdictions, including *Glynwed* and *G.P. Publications*, had held that a successor liability claim is not barred merely because the alleged successor purchased the alleged predecessor's assets "in a commercially reasonable disposition of collateral under the [Uniform Commercial Code]" (*id.* at 1293), including a foreclosure sale. *Id.* However, the court did not decide whether the facts before it supported such a claim or what facts would have to be shown to establish successor liability under the mere-continuation doctrine or any other theory. See *id.* at 1293-94.

defective jack, Vulcan became insolvent and, at a foreclosure proceeding, its assets were acquired by various nonaffiliated entities. One of these was a corporation, Polytex, which acquired a building with a second mortgage; the second mortgagee, also unaffiliated with Vulcan, then redeemed the building. Another secured creditor redeemed the machinery and the equipment. Eventually, Great Lakes acquired some of Vulcan's equipment. *Id.* at 1309-11.

¶ 40    The Supreme Court of Kansas affirmed a judgment holding that Great Lakes was not liable to the plaintiff, as it was not the mere continuation of Vulcan (and there had been no *de facto* merger). In part this was because there was no continuity of ownership. *Id.* at 1312. Further, however, there were no direct transfers of assets or other direct dealings between Vulcan and Great Lakes (*id.* at 1312-13). Great Lakes had acquired "some Vulcan property," but it had done so "as a bona fide purchaser." *Id.* at 1312. Although the court noted that there was no continuity of ownership between the old and new corporations, it also cited a learned treatise for the proposition that, " 'where an individual purchases the assets of a corporation at a foreclosure sale and then resells to a new company composed largely of the members of the company whose assets were sold, and there is no fraud, the new company is not liable for the debts of the old….' " *Id.* (quoting 15 William Meade Fletcher *et al.*, Private Corporations § 7333, at 642-44 (perm. ed.).

¶ 41    Our case is not as clear-cut as either the authority applying the mere-continuation doctrine to sales involving intermediaries or the authority refusing to apply the exception. We acknowledge that there is limited persuasive authority to guide us. However, as noted above, the trial court did not specifically rule on the fraud exception to corporate successor nonliability.[2] Nevertheless, the trial court did make some findings suggesting that the transaction from North Winthrop to CSM/Winthrop Real Estate and then from CSM/Winthrop Real Estate to Steward was, in reality, one integrated transaction arranged in advance between the owners of those companies. This suggestion is evidenced by the court's characterization of CSM/Winthrop Real Estate as the "middleman." Although the trial court did not make a specific finding on the issue of fraud, we find that this issue is so intertwined with the question of whether the transactions in this case were *bona fide* that the fraud question is an essential issue in this case and must be addressed.

¶ 42    As such, we vacate the trial court's judgment and remand the cause for the trial court to reconsider its decision, specifically address the fraud question, and enter an appropriate judgment. We note that in this case there is considerable overlap between the mere-continuation exception and the fraud exception. That is, if fraud tainted the transactions to and from CSM/Winthrop Real Estate, then in actuality there was simply a transaction from North Winthrop to Steward. The use of a straw man would not render the mere-continuation exception inapplicable. See, *e.g.*, *Patin*, 294 F.3d at 651. Indeed, regardless of whether the conduct of the parties in this case fell within the legal definition of fraud, if the transfers involving CSM/Winthrop Real Estate were not *bona fide*, the mere-continuation exception

---

[2]The core of our disagreement with the dissent concerns whether the trial court made a finding regarding fraud and whether the transfers to and from CSM/Winthrop Real Estate were *bona fide*. While the record might support the inferences suggested by the dissent, we do not believe that the trial court's ruling clearly indicates that it actually drew such inferences. Therefore, we believe that the more prudent course is to remand this case to allow the trial court to consider these issues in the first instance.

- 11 -

would apply. On remand, the trial court may, in its discretion, conduct whatever proceedings, if any, it deems advisable.

¶ 43    Vacated and remanded.

¶ 44    JUSTICE JORGENSEN, dissenting.

¶ 45    I agree with the principle, set forth by the majority, that, if the transfers involving CSM were not *bona fide* arm's-length transactions, but were instead part of one prearranged plan, then there was, in reality, a transfer from North Winthrop to Steward.

¶ 46    However, I must respectfully dissent because, unlike the majority, I believe that the trial court did make the factual determination that North Winthrop, CSM, and Steward shared a common plan to move the assets from North Winthrop to Steward. This factual determination is entitled to deference, and there is sufficient evidence to support it.

¶ 47    I think that a deferential, manifest-weight standard of review applies (as opposed to *de novo* review, *supra* ¶ 22). This case does not involve an undisputed set of facts. Rather, as in any case that invokes a deferential standard of review, the trial court was put in the position to weigh the evidence, draw inferences, and make credibility determinations. For example, the court did not have to believe Cartwright's self-serving statements that there was no prearranged transaction and that CSM wanted to sell the property simply because it did not realize how difficult the permitting process would be. There was compelling circumstantial evidence that supported the opposite conclusion. Cartwright began negotiating the second transaction before the first was completed (*supra* ¶ 18). CSM secured the title commitment from Steward within five business days of holding the property. CSM's excuse, that it sought a title commitment to sell the property because it did not realize how difficult the permitting process would be, barely passes the smell test, especially considering that it could not have tried that hard in the merely five business days surrounding the 2012 New Year's holiday. Instead, the court could reasonably have found, based on the circumstances surrounding the sale, that CSM's true motive was a quick and large profit based on a prearranged sale. It also could reasonably have found that, once CSM began the initial transaction, it was effectively bound to North Winthrop and Steward, lest it lose the opportunity for a quick and large profit and be stuck with an asset that it was not prepared to develop.

¶ 48    Next, I disagree that remand is necessary for the trial court to expand upon its findings. The trial court already made its overall finding of mere continuation. Although it can be helpful to do so, a trial court is not required to explain each component of its overall finding. See, *e.g.*, *In re Marriage of Ackerley*, 333 Ill. App. 3d 382, 392 (2002) (we review the result to which the trial court arrived and not its reasoning); *cf. Muck v. Van Bibber*, 223 Ill. App. 3d 830, 836 (1992) (when inadequate trial court findings inhibit our ability to appropriately review a case, remand is appropriate). I believe that, although less than perfect, the trial court's findings are adequate for us to review. The trial court said, in so many words, that the two-part transaction was, in reality, one prearranged transaction. Again, the court repeatedly referred to CSM as a "middleman." A middleman, by definition, from the moment it takes on an asset, never intends to keep it. The court also stressed that the two-part transaction took place "within days," implying a prearranged transaction.

- 12 -

¶ 49    Finally, I believe that the evidence is sufficient to support the trial court's mere-continuation finding. The majority appears to agree (*supra* ¶¶ 41-42) that the evidence was sufficient to find that a prearranged transfer took place (it just disagrees that the trial court actually found that). I will not further describe that evidence, as it is set forth by the majority and in this dissent (*supra* ¶ 47).

¶ 50    For these reasons, I would have affirmed the trial court's judgment.